**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC.; ESPERANZA GOMEZ ESCOBAR, <br><br> *Plaintiffs - Appellees*, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; TODD BLANCHE, Acting Attorney General, in his official capacity as the Acting Attorney General of the United States, <br><br> *Defendants - Appellants*. | No. 25-4238 <br><br> D.C. No. 3:25-cv-00886-JLS-DDL <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

2          NOVEDADES Y SERVICIOS, INC. V. FINCEN

Argued and Submitted February 2, 2026
Pasadena, California

Filed July 13, 2026

Before: Kenneth K. Lee, Lucy H. Koh, and Ana de Alba,
Circuit Judges.

Opinion by Judge Koh;
Dissent by Judge Lee

## SUMMARY[*]

**Preliminary Injunction / Currency Transaction Reports**

The panel affirmed the district court's preliminary injunction in favor of Novedades y Servicios, Inc., a money service business, and its owner enjoining the government from enforcing a Geographic Targeting Order ("GTO") that requires all money services businesses in an area along the southwest border to file currency transaction reports for any cash transaction between $200 and $10,000—a reduction from the longstanding $10,000 reporting threshold.

The Currency and Foreign Transactions Reporting Act ("Bank Secrecy Act") authorizes the Treasury Secretary to require domestic financial institutions to file currency transaction reports with the Financial Crimes Enforcement Network ("FinCEN"), a bureau within the Treasury

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Department. In 1988, Congress enacted an additional provision within the Bank Secrecy Act, authorizing the Secretary to require certain reports by "order," rather than by "regulation" ("Section 5326"), in response to concerns that launderers were dealing in transactions below the $10,000 reporting amount. Orders issued under Section 5326 are commonly referred to as GTOs. In March 2025, FinCEN issued a Border GTO requiring all money services businesses located in 30 specified ZIP codes within five Texas counties and two California counties along the southwest border of the United States to file currency transaction reports for any transaction of more than $200 and less than $10,000.

Addressing the elements required to obtain a preliminary injunction, the panel held that plaintiffs demonstrated a likelihood of success on the merits of each of their following claims under the Administrative Procedure Act ("APA"). Specifically, the panel held that (1) the Border GTO was likely a rule, not an order, under the APA because the Border GTO applies to all unnamed and unspecified money services businesses in 30 ZIP codes with a total population of over one million instead of specific businesses; rests on general facts rather than the adjudication of a particular set of disputed facts; and determines policy issues rather than resolving a dispute between particular parties; (2) FinCEN was required to conduct notice and comment rulemaking before issuing the Border GTO because it was a de facto rule; and (3) the Border GTO was likely adopted in an arbitrary and capricious manner because FinCEN entirely failed to consider the cost of compliance to regulated parties, an important aspect of the problem.

The panel held that the district court did not clearly err in finding that Novedades demonstrated a likelihood of

irreparable harm because it faced a "threat of extinction" and the loss of its customers and goodwill. Novedades, which typically maintains one person on duty at a time, estimated that compliance would require an additional fourteen or more hours of reporting work per day and the hiring of a full-time employee it cannot afford. Novedades estimated the time it would take to comply with the Border GTO based on a conservative estimate that each currency transaction report would require around 25 minutes to complete, far below the currency transaction report's estimate of 40 minutes. Additionally, during the single week the Border GTO was in effect, Novedades lost 50-60% of the customers in the store to whom its owner explained the new reporting requirements, as customers expressed skepticism and fear that providing their personal information would place them on a list of criminals or cause them to be mistaken for criminals and also stated their intent to take their business to money services businesses in unaffected ZIP codes, including a money services business that is only a 5 minute drive from Novedades.

The panel held that the district court did not abuse its discretion in determining that the balance of equities and public interest favored plaintiffs when weighing the concrete threat the Border GTO posed to Novedades's existence and its owner's livelihood against the government's speculative assertions that the Border GTO will keep the public safer.

Finally, the panel held that the district court did not abuse its discretion in limiting the scope of the preliminary injunction to the Southern District of California.

Dissenting, Judge Lee would hold that plaintiffs have not shown irreparable harm to merit the extraordinary remedy of a preliminary injunction. The district court erred by

assuming irreparable harm largely based on blanket assertions of financial burden. He would remand for the district court to further analyze irreparable harm before a preliminary injunction is granted.

## COUNSEL

Robert E. Johnson (argued), Institute for Justice, Shaker Heights, Ohio; Andrew K. Ward and Elizabeth Sanz, Institute for Justice, Arlington, Virginia; Jeffrey Rowes, Institute for Justice, Austin, Texas; Katrin Marquez, Institute for Justice, Miami, Florida; Nilay U. Vora and Jeffrey A. Atteberry, Vora Law Firm PC, Santa Monica, California; for Plaintiffs-Appellees.

Simon G. Jerome (argued) and Sharon Swingle, Attorneys, Appellate Staff; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Stephanie A. Sotomayor, Assistant United States Attorney; Adam Gordon, United States Attorney; Office of the United States Attorney, United States Department of Justice, San Diego, California; for Defendants-Appellants.

Daniel C. Silva and Ava Sadeghi, Buchalter APC, San Diego, California, for Amici Curiae MSBA, Inc. and INFiN Inc.

## OPINION

KOH, Circuit Judge:

On March 14, 2025, the Treasury Department's Financial Crimes Enforcement Network issued a Geographic Targeting Order that requires all money services businesses in an area along the southwest border to file currency transaction reports for any cash transaction between $200 and $10,000—a reduction from the longstanding $10,000 reporting threshold. The covered area consists of 30 ZIP codes spread among five Texas counties and two California counties and covers a population of over one million people. The ZIP codes are non-contiguous and surrounded by non-covered ZIP codes.

Plaintiffs Novedades y Servicios, Inc., a small money services business, and Esperanza Gomez Escobar, Novedades's owner, filed a lawsuit seeking to enjoin the government from enforcing the Geographic Targeting Order. The district court granted Plaintiffs' motion for a preliminary injunction. For the reasons stated below, we affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Statutory Background

#### 1. Currency Transaction Reports

Congress enacted the Currency and Foreign Transactions Reporting Act ("Bank Secrecy Act") in 1970, "in response to increasing use of banks and other institutions as financial intermediaries by persons engaged in criminal activity." *Ratzlaf v. United States*, 510 U.S. 135, 138 (1994); *see* Pub. L. No. 91-508, 84 Stat. 1114 (1970). The Bank

Secrecy Act authorizes the Treasury Secretary ("Secretary") to require "a domestic financial institution" to file reports on cash transactions "in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation" under 31 U.S.C. § 5313 ("Section 5313").

In 1972, after notice and comment rulemaking, the Treasury Department issued a rule that required financial institutions to file reports on cash transactions over $10,000. *See* 37 Fed. Reg. 6912 (Apr. 5, 1972) (codified at 31 C.F.R. § 1010.311). These reports are commonly referred to as "Currency Transaction Reports" or "CTRs." The current version of the CTR form requests the name, address, Social Security number, and occupation of the transacting party, as well as the type of identification used to verify the transacting party's identity.

CTRs are filed with the Financial Crimes Enforcement Network ("FinCEN"), a bureau within the Treasury Department. *See* 31 C.F.R. § 1010.306(a)(3); 31 U.S.C. § 310. By statute, FinCEN "[a]nalyze[s] and disseminate[s] the available data" to "identify possible criminal activity" and to "support ongoing criminal financial investigations and prosecutions," among other responsibilities. 31 U.S.C. § 310(b)(2)(C). FinCEN maintains a searchable database of CTRs, to which it provides access to local, state, federal, and foreign law enforcement.

Pursuant to its obligations under the Paperwork Reduction Act, FinCEN has estimated how long it takes to file a CTR. *See* 85 Fed. Reg. 29022 (May 14, 2020); 44 U.S.C. § 3501, *et seq*. FinCEN estimated that it takes non-bank filers such as money services businesses around 22 to 24 minutes to file each CTR if they do not have automated

processes. *See* 85 Fed. Reg. at 29029. The current version of the CTR form also states that the "[p]ublic reporting and recordkeeping burden for this collection of information is estimated to average 40 minutes per response."

### 2.   Geographic Targeting Orders

In 1988, Congress enacted an additional provision within the Bank Secrecy Act that authorizes the Secretary to require certain reports by "order," rather than by "regulation," as authorized under Section 5313. Pub. L. 100-690, tit. VI, § 6185(c), 102 Stat. 4181, 4355 (1988). Congress added this provision, now codified at 31 U.S.C. § 5326 ("Section 5326"), in response to concerns that "launderers [were] dealing in transactions below the $10,000 reporting amount." 134 Cong. Rec. H7078 (daily ed. Sep. 7, 1988) (statement of Rep. St. Germain). Orders issued under Section 5326 are commonly referred to as "geographic targeting orders" or "GTOs."

In its present form, Section 5326 authorizes the Secretary to issue an order requiring "any domestic financial institution or nonfinancial trade or business," or any group of such entities, in a geographic area to obtain and report information concerning transactions, when the Secretary "finds . . . that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the Bank Secrecy Act] or to prevent evasions thereof." 31 U.S.C. § 5326(a). The Secretary "may prescribe" the threshold above which transactions must be reported. *Id.* § 5326(a)(1)(A). GTOs issued under Section 5326 are limited to a maximum duration of 180 days, unless renewed. *Id.* § 5326(d). Section 5326 also provides that GTOs are presumptively confidential—entities "subject to an order under this

section" may not "disclose the existence of, or terms of, the order to any person except as prescribed by the Secretary." *Id.* § 5326(c).

In 1989, after notice and comment rulemaking, the Treasury Department issued a rule governing the issuance of GTOs. *See* 31 C.F.R. § 1010.370; 54 Fed. Reg. 33675. The rule provided that a GTO "shall be directed to the Chief Executive Officer" of the targeted business and should require reports of transactions "by, through or to such financial institution specified in the order." 31 C.F.R. § 1010.370(b).

The preamble to the rule described how FinCEN expected GTOs to work. After selecting a geographic area—which could range from "a few city blocks" to "a major metropolitan area"—the agency would "identify the affected financial institution or institutions in the geographic area that would receive the targeting order." 54 Fed. Reg. at 33675-76. "[G]eographic targeting orders would not be published in the Federal Register, but would be issued only to the affected financial institutions," generally by "certified or registered mail, return receipt requested." *Id.* at 33676-77. To ensure compliance, the agency would "contact the institution a few days after [the order] has been sent." *Id.* at 33677. The agency also explained why GTOs are presumptively confidential: "[O]nce criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." *Id.* at 33678.

### 3. Money Services Businesses

In 1999, after notice and comment rulemaking, FinCEN issued a rule defining a category of businesses subject to the Bank Secrecy Act called "money services businesses"

("MSBs"). 64 Fed. Reg. 45438 (Aug. 20, 1999). MSBs are non-bank financial institutions that offer limited services, such as currency exchanges, money orders, check cashing, and money transfers. 31 C.F.R. § 1010.100(ff).

Under this rule, MSBs are required to file CTRs for cash transactions over $10,000. *See id.* § 1010.311. MSBs are also subject to other obligations under the Bank Secrecy Act—*i.e.*, they must register with FinCEN, *see id.* § 1022.380; maintain an effective anti-money laundering program, *id.* § 1022.210; and, like banks and other financial institutions, report suspicious transactions, including those structured to evade the CTR requirement, *see id.* § 1022.320.

## B.  Factual Background

### 1.  Border GTO

On March 14, 2025, FinCEN issued a Geographic Targeting Order ("Border GTO") applicable to "certain money services businesses along the southwest border of the United States." 90 Fed. Reg. 12106, 12106 (Mar. 14, 2025). The Border GTO required all MSBs located in 30 specified ZIP codes within five Texas counties and two California counties to file CTRs for any transaction of more than $200 and less than $10,000. *Id.* at 12107. The targeted ZIP codes are not contiguous, and some are surrounded by untargeted ZIP codes. The Border GTO further stated that each MSB must "comply with the identification requirements set forth at 31 C.F.R. 1010.312," *id.*, which requires collecting the name, address, and Social Security or taxpayer identification number of the transacting party.

The Border GTO stated that targeted MSBs "may be liable, without limitation, for civil or criminal penalties for violating any of the terms of this Order." *Id.* at 12108. In a

Frequently Asked Questions document that FinCEN subsequently provided, FinCEN explained that penalties for willful violations may result in both civil and criminal penalties. Civil fines can be up to $71,545 per transaction and criminal penalties include fines of up to $250,000 and imprisonment of up to five years. FinCEN, *Frequently Asked Questions* (Mar. 24, 2025) (citing 31 C.F.R. §§ 1010.821, 1010.840), https://perma.cc/FWE2-KJBJ. Even negligent violations can trigger penalties of $1,430 per violation. *See* 31 C.F.R. § 1010.821.

Contrary to the Treasury Department's earlier stated expectation that GTOs "would not be published in the Federal Register," 54 Fed. Reg. at 33676, and contrary to the statutory presumption that GTOs are confidential, *see* 31 U.S.C. § 5326(c), the Border GTO was published in the Federal Register. 90 Fed. Reg. at 12106. The Border GTO took effect on April 14, 2025.

### 2. Plaintiffs

Plaintiff Novedades y Servicios, Inc., ("Novedades") is a small MSB that provides money transfers, money orders, and check cashing services. Novedades is in San Diego and is covered by the Border GTO. Plaintiff Esperanza Gomez Escobar ("Escobar") owns and manages Novedades. Many of Novedades's customers are low income and do not use banks. A typical Novedades customer might cash a paycheck and go across the street to buy groceries.

Novedades never filed a CTR before the Border GTO was issued because in "all the years that it has been in business, [Novedades] has never completed a cash transaction over $10,000." Escobar estimated that Novedades usually processes 1,200-1,300 money transfers, cashes 800-900 checks, and sells 200-300 money orders per

month; and that the "Border GTO applies to nearly all of Novedades's transactions—at least 99%."

During the week that the Border GTO was in effect, Novedades reported losing approximately 50 to 60 percent of its customers in the store to whom Escobar explained the new reporting requirements imposed by the Border GTO.[1] According to Plaintiffs, the Border GTO imposed a burden of an additional 14-17 hours per day of reporting work, which "does not even include the time spent explaining to customers why Novedades now has to take their personal information." Plaintiffs alleged that the time it took to ask for information from customers was "a huge burden," and that "[c]ustomers [did] not understand the purpose of the Border GTO," and "were worried that they [would] be put on a list with the names of criminals or be mistaken for criminals" if they provided their personal information. Further, Escobar stated that "customers were reluctant to give [her] their personal information and expressed skepticism and fear"; told her that they "planned to go to MSBs in unaffected zip codes"; and "one customer even told [her] that an MSB in an unaffected zip code had called him to convince him to go there instead." At least one similar MSB that is not covered by the Border GTO operates just "a five-minute drive from Novedades."

## C. Procedural Background

Plaintiffs filed their complaint on April 15, 2025, seeking declaratory and injunctive relief on the basis that, as relevant to this appeal, the Border GTO violated the Administrative

---

[1] A similarly situated San Diego MSB also reported losing 50 to 60 percent of its customers during the period the Border GTO was in effect. Comparable evidence from Texas businesses subject to the Border GTO showed similar declines.

Procedure Act ("APA") and the Fourth Amendment. In their complaint, Plaintiffs stated that Novedades would "have to hire at least one full-time employee just to prepare CTRs" to face this paperwork burden, "assuming customers do not just take their business elsewhere." Plaintiffs asserted that "Novedades expects to be put out of business by the Border GTO," because it "cannot afford to hire an entire full-time employee just to prepare CTRs," and that, alternatively, "Novedades also cannot survive if its customers stop coming to the business."

On April 16, 2025, Plaintiffs moved for a temporary restraining order ("TRO") seeking to enjoin the government from enforcing the Border GTO, which was issued on March 14, 2025, and took effect on April 14, 2025. On April 18, 2025, the government opposed the motion for a TRO and submitted an internal FinCEN "Information Memorandum," dated "March XX," ("March XX Memo") as evidence. The March XX Memo was subsequently entered as part of the administrative record. The rest of the administrative record consists of the documents cited in the March XX Memo.

The March XX Memo appears to be in draft form. The document contains multiple redlined changes throughout. Additionally, a "Clearance Sheet" accompanying the memorandum shows that it was "[d]rafted" in February 2025, and the dates on which the memorandum was "[c]leared" by FinCEN's "Principal Deputy Assistant General Coun[sel]" and "[a]pproved" by FinCEN Director Gacki are left blank.

The March XX Memo is also heavily redacted. Every header and footer of the document is redacted, along with the entirety of the "Analytic Plan" section of the memorandum and most of the "Conclusion" section.

At the TRO motion hearing on April 22, 2025, the district court expressed some concern regarding the March XX Memo and asked the government whether the memorandum was "ever put out," because "[i]t doesn't have a real date on it." In response, the government stated that it "[didn't] know the answer to that question." On April 22, 2025, the district court granted Plaintiffs' motion for a TRO and enjoined enforcement of the Border GTO within the Southern District of California.

Subsequently, on April 29, 2025, Plaintiffs filed a motion for preliminary injunction. At the preliminary injunction hearing on May 15, 2025, the district court noted again its concern over the March XX Memo, asking the government whether the memorandum "could be an after-the-fact rationalization and quick job to justify what was done?" In response, the government referenced "the presumption of regularity," but counsel again stated, "I don't have any factual information about the reason for the xx" and stated that "I don't know what that xx means." At the hearing, the district court also asked Plaintiffs about the possibility of using software to automate the CTR filing process. Plaintiffs responded that such software is "typically not designed for small businesses," and alleged that even if software could reduce the time it takes to file each CTR to merely four minutes, Novedades would still have to do "almost five hours per day of added paperwork." Plaintiffs also reiterated that explaining the Border GTO's requirements to customers and collecting customers' information would remain time consuming even if the filing burden were minimized.

On May 15, 2025, the district court entered a preliminary injunction in an oral ruling, supplemented by a written order on May 21, 2025. The court held that Plaintiffs were likely

to succeed on their claims under the APA that: (1) the Border GTO was promulgated in excess of statutory authority, *see* 5 U.S.C. § 706(2)(C); (2) FinCEN failed to conduct notice and comment rulemaking before issuing the Border GTO, *see id.* § 553; and (3) the Border GTO was adopted in an arbitrary and capricious manner, *see id.* § 706(2)(A). The district court also determined that Plaintiffs had demonstrated a likelihood of irreparable harm because Plaintiffs established that they faced a "threat of extinction" and the loss of customers and goodwill due to the Border GTO. Finally, the district court held that the balance of the equities and the public interest favored the grant of a preliminary injunction. The district court limited the scope of the preliminary injunction to "all covered businesses" defined in the Border GTO "that are located in the Southern District of California."

This appeal followed.

## D.  Subsequent GTOs

The Border GTO expired on September 9, 2025. On September 10, 2025, FinCEN issued a second GTO ("Second GTO"). *See* 90 Fed. Reg. 43557 (Sep. 10, 2025). The Second GTO imposes identity-verification and reporting requirements like those imposed by the Border GTO but sets a minimum reporting threshold of $1,000 rather than $200. *Id.* at 43557-58. The Second GTO also extends the reporting requirements to two Arizona counties and certain other areas in Texas, in addition to the California and Texas ZIP codes previously covered by the Border GTO. *Id.* at 43558. The Second GTO exempts "any money services business to which the government is enjoined by court order from applying the" Border GTO "for the period during which an applicable injunction remains in force." *Id.* On

appeal, the government asserts that the preliminary injunction at issue applies only to the Border GTO "published in the Federal Register on March 14, 2025," not to the Second GTO.

The Second GTO expired on March 6, 2026. On March 10, 2026, FinCEN issued a third GTO ("Third GTO"), effective through September 2, 2026. *See* 91 Fed. Reg. 11456 (March 10, 2026). This Third GTO also imposes identity-verification and reporting requirements like those imposed by the Border GTO and Second GTO. Like the Second GTO, it sets the minimum reporting threshold of $1,000, but it also extends those requirements to additional counties in Arizona and New Mexico. *See id.* at 11456-57. The Third GTO also continues to "exempt" MSBs to which the government is enjoined from applying the Border GTO "until that injunction is lifted." *Id*. at 11457 n.8. The government continues to maintain that "only the merits of [the Border GTO] are before the Court in this appeal" and that this court "should reject plaintiffs' attempts to inject the third order into the merits of this case."

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1292(a)(1). "We review for abuse of discretion a district court's decision regarding preliminary injunctive relief. We review findings of fact for clear error and conclusions of law de novo." *BNSF Ry. Co. v. County of Alameda*, 7 F.4th 874, 878-79 (9th Cir. 2021) (internal citation omitted). "A factual finding is clearly erroneous if it is illogical, implausible, or without support in inferences that may be drawn from the record." *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1133 (9th Cir. 2021) (citation modified). Under this standard, we "will not reverse the district court's [preliminary injunction]

decision simply because we would have arrived at a different result if we had applied the law to the facts of the case." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (citation modified). "We review the scope of the district court's preliminary injunction for abuse of discretion." *Nat'l Urb. League v. Ross*, 977 F.3d 770, 776 (9th Cir. 2020) (citation omitted).

## III.  DISCUSSION

The government argues that the district court abused its discretion in granting the preliminary injunction and that the scope of the preliminary injunction is overbroad. We address each argument in turn, and we affirm.

### A.  Grant of Preliminary Injunction

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a court may issue a TRO or preliminary injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135

18          NOVEDADES Y SERVICIOS, INC. V. FINCEN

(citation modified). The moving party bears the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

### 1. Likelihood of Success on the Merits

We begin with Plaintiffs' likelihood of success on the merits. The district court held that Plaintiffs are likely to prevail on each of their following claims under the APA: (1) the Border GTO was an unlawful rule that was promulgated in excess of FinCEN's statutory authority under Section 5326, which only authorizes FinCEN to act by order; (2) FinCEN was required to conduct notice and comment rulemaking before issuing the Border GTO because it was a de facto rule; and (3) the Border GTO was adopted in an arbitrary and capricious manner.[2] For the reasons stated below, we affirm the district court's holding as to each of these three claims.

### a. *Statutory Authority Under Section 5326*

Plaintiffs are likely to succeed on the merits of their claim that the Border GTO is a de facto statutory rule and therefore violates Section 5326, which only authorizes FinCEN to act by "order." 31 U.S.C. § 5326. Section 5326 provides that if FinCEN finds "reasonable grounds" under the statutory criteria, then FinCEN "may issue an *order* requiring" reports. *Id.* § 5326(a) (emphasis added).

---

[2] Because the district court held that Plaintiffs were likely to succeed on their APA claims, the district court declined to address Plaintiffs' claim that the Border GTO also violated the Fourth Amendment. We similarly decline to do so. *See Camreta v. Greene*, 563 U.S. 692, 705 (2011) (observing that a "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them" (citation omitted)).

The U.S. Supreme Court has recognized that the APA distinguishes between rules, which result from rulemakings, and orders, which result from adjudications, on the basis that rulemakings are "proceedings for the purpose of promulgating policy-type rules or standards" and adjudications are "proceedings designed to adjudicate disputed facts in particular cases." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Under the APA, rulemaking is the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). An "adjudication," by contrast, is the "agency process for the formulation of an order." *Id.* § 551(7). An "order" is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6).

As a preliminary matter, and as both parties agree, the use of "order" within Section 5326 incorporates the meaning of "order" within the APA because "order" is a term of art within administrative law. *See FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 234-35 (2025) (holding that a "'term of art' across administrative law" "carries the same meaning outside the APA as in it"). Further, we may presume that Congress intentionally incorporated the meaning of "order" under the APA when Congress used the word "order" in Section 5326, because the distinction between rules and orders under the APA was well understood at the time that Section 5326 was enacted in 1988. *See Fla. E. Coast Ry. Co*, 410 U.S. at 244-45 (explaining the "basic distinction between rulemaking and adjudication"); *Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. 204, 217 (1988) (Scalia, J., concurring) (noting that the "central distinction between rulemaking and adjudication" is that "rules have legal consequences only for the future"); *Bartenwerfer v. Buckley*, 598 U.S. 69, 80 (2023) (noting that the U.S. Supreme Court "generally assumes that, when Congress enacts statutes, it is aware of th[e] Court's relevant precedents" (citation omitted)).

The Ninth Circuit has set forth three main considerations in distinguishing between a rule and an order under the APA: "(1) whether the government action applies to specific individuals or to unnamed and unspecified persons; (2) whether the promulgating agency considers general facts or adjudicates a particular set of disputed facts; and (3) whether the action determines policy issues or resolves specific disputes between particular parties." *Gallo v. U.S. Dist. Ct. for the Dist. of Ariz.*, 349 F.3d 1169, 1182 (9th Cir. 2003) (citing *Fla. E. Coast Ry. Co.*, 410 U.S. at 245).

Each of these three considerations counsels in favor of holding that the Border GTO is a rule and not an order. First, the Border GTO applies to "unnamed and unspecified persons" rather than "specific individuals," *see id.* at 1182: it applies to all MSBs who conduct cash transactions above $200 in a geographic area with a population of over a million people, *see* 90 Fed. Reg. at 12107. On this first consideration, the government argues that the Border GTO is specific rather than generally applicable because the Border GTO applies to "a particular type of business within certain ZIP codes" and is temporally limited. But the fact that the Border GTO applies to a regulatory category (*i.e.*, MSBs), and not to specific, identified businesses, is precisely what makes it a rule. And it does not matter that the Border GTO targeted specific ZIP codes and lasted for

180 days, because rules can be geographically and temporally limited. *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (import restriction limited to Zimbabwe was a rule); *Michigan v. EPA*, 213 F.3d 663, 669 (D.C. Cir. 2000) (rule mandating that 22 states revise their implementation plans); *NRDC v. EPA*, 279 F.3d 1180, 1183, 1186 (9th Cir. 2002) (permit issued to "entire class of hypothetical dischargers in a given geographical region" was a rule requiring notice and comment); *Billings Clinic v. Azar*, 901 F.3d 301, 302 (D.C. Cir. 2018) (assessing HHS rulemakings that set reimbursement rates for specific fiscal years).

Second, FinCEN considered "general facts" rather than "adjudicat[ing] a particular set of disputed facts" in issuing the Border GTO. *See Gallo*, 349 F.3d at 1182. Even though FinCEN "obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order." *Fla. E. Coast Ry. Co.*, 410 U.S. at 246. For example, FinCEN found that "reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the [Border] GTO are necessary to carry out the purposes of the BSA or to prevent evasions thereof," and that the Border GTO would further the "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States." 90 Fed. Reg. at 12107. These factual inferences are classic examples of "factual inferences [] used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts." *Fla. E. Coast Ry. Co.*, 410 U.S. at 246.

Third, the Border GTO "determines policy issues" rather than "resolves specific disputes between particular parties."

*See Gallo*, 349 F.3d at 1182; *see also Safari Club Int'l*, 878 F.3d at 333 (a determination about importing ivory was a "rule" because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties"). The Border GTO does not resolve any dispute between particular parties and, in fact, the government characterizes the Border GTO as involving "policy decisions." Relevant to this third consideration, the government contends that FinCEN did make particularized findings as to the thirty ZIP codes covered by the Border GTO, selecting the ZIP codes based on risk factors such as proximity to the border and historical per capita CTR filings. But the particularized findings of an adjudication—which results in an order—must be made with respect to the regulated *parties*, not merely the regulated geography. *See Fla. E. Coast Ry.*, 410 U.S. at 246 ("No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances."); *cf. United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (involving a 1991 GTO issued to a single money remitter after a government informant uncovered evidence of wrongdoing and the IRS had executed a search warrant on the remitter).

The government's remaining argument to the contrary is not persuasive. It makes a circular argument that if FinCEN finds "reasonable grounds" as required by Section 5326, then "the action that results is" definitionally "an 'order.'" Under the government's interpretation, so long as it labels its action an "order," FinCEN can impose new reporting obligations for any category of regulated businesses in any part of the country.

We decline to allow the government to use labels to avoid complying with the text of Section 5326, which

requires FinCEN to act by "order." It is well established that in evaluating whether an agency action is an order or a rule, "courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*," when deciding on the legal significance of any given administrative action. *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) (emphasis in original). An agency cannot circumvent the APA's rulemaking procedures by, for example, using adjudication "to amend a recently amended rule" or "to bypass a pending rulemaking proceeding." *Union Flights, Inc. v. Adm'r, FAA*, 957 F.2d 685, 689 (9th Cir. 1992).

Additionally, the government's preferred interpretation of Section 5326 renders FinCEN's rulemaking power under Section 5313 essentially superfluous. Recall that Section 5313 allows the Treasury to pass a "regulation," *i.e.*, a "rule," to broadly require businesses to file CTRs. *See* 31 U.S.C. § 5313(a); *see also supra* Section I.A.1. The government asks this court to bypass Section 5313 and allow FinCEN to promulgate a rule requiring CTRs under Section 5326 by merely labeling the action an "order," thus dispensing with rulemaking requirements under Section 5313. This contradicts the basic canon of statutory interpretation that counsels that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction

§ 46.06, pp. 181-86 (rev. 6th ed. 2000)). [3] Thus, the Border GTO is likely a rule and not an order under the APA. [4]

### b.  Notice and Comment

Plaintiffs are likely to succeed on the merits of their claim that the Border GTO was a de facto rule that failed to follow the required notice and comment procedures under 5 U.S.C. § 553. We have explained that notice and comment procedures, including a "notice and comment period[,] is generally required for agency rulemaking, but not for adjudications." *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th Cir. 2008) (first citing 5 U.S.C. § 553; and then citing *Yesler Terrace Cmty. Council v. Cisneros*, 37

---

[3] Minor differences would remain between Section 5313 and Section 5326—for example, an "order" under Section 5326 is valid for only 180 days, though it can be renewed repeatedly.

[4] The government also invokes two Fifth Circuit decisions to support its argument that "investigatory" actions cannot be rules: *United States v. W. H. Hodges & Co.*, 533 F.2d 276 (5th Cir. 1976), and *Genuine Parts Co. v. Federal Trade Commission*, 445 F.2d 1382 (5th Cir. 1971). "Out-of-circuit cases are not binding on this Court and therefore do not constitute 'controlling authority.'" *Farrakhan v. Gregoire*, 590 F.3d 989, 1000 (9th Cir. 2010), *overruled on other grounds*, 623 F.3d 990 (en banc). Furthermore, *W. H. Hodges* and *Genuine Parts* are inapposite because they both concerned investigatory actions that targeted specific entities. *W. H. Hodges* held that an order that directed 38 companies to provide information "in the course of an investigation of rates charged by stockyard marketing agencies in Louisiana" was not a rule because it was directed to specific companies based on a particularized need. 533 F.2d at 278. *Genuine Parts* concerned investigatory actions that targeted a specific company. 445 F.2d at 1388. By contrast, the Border GTO is likely a rule because it requires reporting by a category of companies, rather than directing specific companies to provide information based on particularized facts. *See Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1147, 1151 (5th Cir. 1984) (holding that an agency action that set out "criteria and method[s]" for information gathering was a rule).

F.3d 442, 448 (9th Cir. 1994)). Even "[a]n agency adjudication may require a notice and comment period if it constitutes de facto rulemaking that 'affects the rights of broad classes of unspecified individuals.'" *Id.* (quoting *Cisneros*, 37 F.3d at 448).

The government does not dispute that the Border GTO did not undergo the notice and comment procedures that the APA requires in rulemaking. Instead, the government contends that because the Border GTO is an order and not a rule under the APA, FinCEN was not required to go through notice and comment procedures prescribed by the APA. Because we agree with the district court that the Border GTO is likely a rule, as explained above, this argument fails. *See* Section III.A.1.a.

We also reject any suggestion that Section 5326 excuses FinCEN from notice and comment procedures. The APA provides that, if a statute is to excuse an agency from APA procedural requirements, it must "do[] so expressly." 5 U.S.C. § 559; *see also Barahona-Gomez v. Reno*, 167 F.3d 1228, 1235 (9th Cir. 1999) ("Except in specified circumstances, an agency cannot promulgate a rule without first following the APA's notice and comment procedures."). Congress knows how to clearly exempt an agency from notice and comment requirements, and it did not do so here. *See, e.g.*, 42 U.S.C. § 7407(d)(2)(B) (certain EPA actions "shall not be subject to the provisions of sections 553 through 557 of title 5 (relating to notice and comment)"). Nothing in Section 5326 provides FinCEN with express permission to dispense with notice and comment processes. Therefore, we decline to exempt FinCEN from complying with notice and comment procedures.

### c.  Arbitrary and Capricious

Plaintiffs are likely to succeed on the merits of their claim that FinCEN issued the Border GTO in an arbitrary and capricious manner. The APA permits a reviewing court to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether an agency acted arbitrarily and capriciously, a court must be "searching and careful" in its review of the agency action but "is not to substitute its judgment for that of the agency." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000) (quoting *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993)). The court's review "is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

The Border GTO was likely arbitrary and capricious because FinCEN failed to take into account the cost of compliance to regulated parties when considering whether to issue the Border GTO. An agency action is arbitrary and capricious if, *inter alia*, the agency fails "to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The cost of compliance is an "important aspect of the problem" of whether to take an agency action. *See Michigan*, 576 U.S. at 759 (holding that an agency "must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary").

The statement that accompanied the Federal Register publication of the Border GTO does not mention the cost of

compliance or any burden the Border GTO might impose on regulated MSBs. To support its argument that FinCEN did consider the cost of compliance, the government points only to the March XX Memo to indicate that FinCEN considered compliance costs.

Although "an agency's statement of what is in the [administrative] record is subject to a presumption of regularity," that presumption can be rebutted. *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (citation omitted); *see R.H. Stearns Co. of Boston v. United States*, 291 U.S. 54, 63 (1934) ("No doubt the presumption of regularity is subject to be rebutted."). In this case, that presumption is rebutted because the district court found that "the administrative record contains no clear indication that the agency considered *anything at all* prior to issuing the [Border] GTO," including the March XX Memo. The district court did not clearly err in making this finding, which is well-supported by the record. *See BNSF Ry. Co.*, 7 F.4th at 879 (reviewing factual findings for clear error).

To begin with, the March XX Memo affirmatively indicates that it is in draft form. It has no date; includes multiple redline edits; and the memorandum itself indicates that it was never reviewed by FinCEN officials who had the authority to issue the Border GTO. For instance, the "Clearance Sheet" that accompanies the March XX Memo shows that it was "[d]rafted" in February 2025 and explicitly leaves blank the dates on which the memorandum was either "[c]leared" by FinCEN's "Principal Deputy Assistant General Coun[sel]" or "[a]pproved" by FinCEN Director Gacki. The document is also highly irregular and is heavily redacted. Every header and footer of the document is redacted, along with the entirety of the "Analytic Plan" and most of the "Conclusion" sections of the memorandum.

Furthermore, despite being given multiple opportunities to do so, the government failed to present any evidence that FinCEN relied upon the March XX Memo in issuing the Border GTO. In fact, the government repeatedly declined to even provide the district court with any explicit assurance that FinCEN relied upon the March XX Memo in issuing the Border GTO. The district court noted its "concern over the missing date on the FinCEN Memo" on multiple occasions. The district court first asked the government at the TRO hearing, on April 22, 2025, whether the March XX Memo was "ever put out" because "[i]t doesn't have a real date on it." In response, the government stated that it "[didn't] know the answer to that question."

At the preliminary injunction hearing on May 15, 2025, the district court noted again its concern over the March XX Memo, asking the government directly whether the memorandum "could be an after-the-fact rationalization and quick job to justify what was done?" Rather than directly responding, the government referenced "the presumption of regularity," but again stated, "I don't have any factual information about the reason for the xx" and "I don't know what that xx means." On appeal, the government again refers only to the presumption of regularity that is ordinarily afforded to the agency in assembling the administrative record and still provides no clear answers as to the March XX Memo.

Therefore, the presumption of regularity is rebutted as to the March XX Memo. The district court's finding that the administrative record contains no clear indication of the agency's consideration of costs is supported by each of the memorandum's irregularities noted above and the government's own behavior throughout this litigation.

Accordingly, we may not treat the March XX Memo as a justification for the Border GTO. In assessing whether the agency considered the relevant factors, we are limited to "the grounds that the agency invoked when it took the action." *Regents of the Univ. of Cal.*, 591 U.S. at 20 (citation omitted). We "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r of Soc. Sec. Admin*, 454 F.3d 1050, 1054 (9th Cir. 2006) (citations omitted). Based on the record that is properly before this court, which includes no evidence that FinCEN considered the cost of compliance with the Border GTO, Plaintiffs are likely to prevail on their claim that FinCEN acted arbitrarily and capriciously.[5]

### 2. Likelihood of Irreparable Harm

On the second prong of the preliminary injunction analysis, the district court found that Plaintiffs established a

---

[5] The dissent notes that the district court analyzed Plaintiffs' arbitrary and capricious claim under the assumption that the March XX Memo "did pre-date the Border GTO." Dissent at 51-52 n.6. However, the district court also noted that this assumption "rests on shaky grounds." And even though the district court analyzed whether the March XX Memo itself adequately considered the cost of compliance, the district court also made a finding that "the administrative record contains no clear indication that the agency considered *anything at all* prior to issuing the [Border] GTO," including the March XX Memo. We may affirm the district court's preliminary injunction "on any ground supported by the record." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1125 (9th Cir. 2024) (citation omitted). Because we affirm the district court's judgment that the Border GTO was likely arbitrary and capricious on the basis that FinCEN entirely failed to consider the cost of compliance in issuing the Border GTO, "it is unnecessary for us to consider the district court's alternative grounds" for holding that the Border GTO was likely arbitrary and capricious, "and we do not address them." *City & County of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020).

likelihood of irreparable harm because Plaintiffs showed a sufficient "threat of extinction" due to the Border GTO. That finding is supported by the record and is not clearly erroneous. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 795 (9th Cir. 2005) ("Viewing the record as a whole with our deferential standard of review, we cannot say that the district court's factual finding concerning irreparable harm was clearly erroneous.").

Although "monetary injury is not normally considered irreparable," the "threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citation modified). That is true even if recovery for monetary losses is available, because "the loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners" is irreparable harm separate from the related monetary losses, since "[w]hat plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." *Id.* (citation modified). Therefore, "showing a threat of extinction is enough to establish irreparable harm." *Id.* (citation modified). Additionally, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm" independent of a threat of being put out of business because they are often not quantifiable and cannot be fully remedied with a financial award. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *cf. Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519 (9th Cir. 1984) (the fact that "monetary losses can indeed attend the infliction of

intangible injuries" does not "require[] that this court ignore an otherwise unambiguous finding of intangible injury").

A plaintiff need not present trial-ready proof of impending insolvency or loss of customers to show irreparable harm, because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The filing burden that the Border GTO imposes on Novedades supports the district court's irreparable harm finding. Plaintiffs' Complaint alleged Novedades would need to spend approximately "14.8 and 17.26 hours per day" to file CTRs based on the number of checks that Novedades expects to cash per month, which does not account for the time it takes to explain the new reporting requirements to customers. Novedades estimated that each CTR would take around 25 minutes to complete. That estimate is consistent with FinCEN's own estimates of the time it takes to file a CTR because FinCEN has issued both comparable and higher estimates of the time required. For example, in FinCEN's 2020 report, the agency calculated that non-automated and non-bank filers such as Novedades will need 23.93 minutes to file each CTR report. *See* 85 Fed. Reg. at 29029. Additionally, the current version of the CTR form includes an even higher estimate of the time to complete each response: "40 minutes per response." Based on Novedades's conservative 25-minute estimate, Novedades estimated that it would therefore need to hire at least one additional full-time employee to file CTRs, a cost that Escobar stated Novedades is unable to absorb. The district court did not clearly err in finding that such a regulatory

burden is "unsustainable" for Novedades, "a business that typically maintains one person on duty at a time."

Plaintiffs' evidence of "threatened loss of prospective customers or goodwill" caused by the Border GTO also independently supports the district court's irreparable harm finding.[6] *Stuhlbarg*, 240 F.3d at 841. In this case, Escobar attested that "[c]ustomers [did] not understand the purpose of the Border GTO," and "were worried that they [would] be put on a list with the names of criminals or be mistaken for criminals" if they provided their personal information. Escobar also attested that customers "were reluctant to give [her] their personal information and expressed skepticism and fear"; customers told Escobar that they "planned to go to MSBs in unaffected zip codes"; and "one customer even told [Escobar] that an MSB in an unaffected zip code had called him to convince him to go there instead." Furthermore, on this record, Novedades's loss of customers is concrete. During the week that the Border GTO was in effect in the Southern District of California, Novedades lost 50 to 60 percent of its customers in the store to whom Escobar explained the reporting requirements imposed by

---

[6] The dissent suggests that the loss of goodwill and reputation must itself threaten Novedades's existence to qualify as irreparable injury. Dissent at 43 n.3 (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). However, our precedent subsequent to *American Passage Media* treats the threatened loss of prospective customers and goodwill as an intangible injury that independently supports a finding of irreparable harm separate from monetary injury that forms a threat to the business's existence. *See Stuhlbarg*, 240 F.3d at 841 (discussing plaintiff's loss of "large new customers" without discussing an existential threat to plaintiff's business); *Rent-A-Ctr.*, 944 F.2d at 603 (discussing only "damage to ongoing recruitment efforts and goodwill").

the Border GTO.[7] That is likely because customers have at least one easy alternative to Novedades. It is undisputed that a comparable MSB not subject to the Border GTO exists just a five-minute drive from Novedades.

Indeed, the government conceded before the district court that "there is evidence of harm in the record" and agreed that the harms Plaintiffs experienced "have gone beyond any speculation" because Plaintiffs "had some experience with this order being in effect."

The dissent would require considerably more from Novedades. Among other things, the dissent would require Novedades to supply revenue and loss figures, payroll estimates, an analysis of alternative filing solutions, and even data on the elasticity of customer demand, even though "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. In the dissent's view, without such information, Novedades is left with only "unsupported predictions of revenue loss" that cannot establish the requisite "immediate threat" of irreparable harm. Dissent at 42 n.2 (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674-76 (9th Cir. 1988)).

But the dissent ignores the fact that Novedades's losses are not predictions, and they were not remote. In addition to the filing burden, harm materialized immediately to Novedades during the single week in which the Border GTO

---

[7] We note that other MSBs subject to the Border GTO faced similar losses, such as an MSB in San Diego that reported losing 50 to 60 percent of its customers during the period the Border GTO was in effect and MSBs in Texas that were subject to the Border GTO that also reported loss of customers.

was in effect because Novedades lost 50 to 60 percent of its customers in the store who learned of the Border GTO's reporting requirements from Escobar. That loss of customers is attributable to the Border GTO because Novedades's customers expressed skepticism and fear about having to give personal information required by the Border GTO and at least one customer told Escobar that they planned to go to other MSBs not subject to the Border GTO. Novedades is thus unlike the plaintiffs in *Caribbean Marine*, who offered only "[s]ubjective apprehensions" about possible harms that had not yet occurred. 844 F.2d at 675. Plaintiffs in *Caribbean Marine* sought to enjoin a policy that would place female observers on board to enforce the Marine Mammal Protection Act and argued that irreparable harm was likely because their employees may "respond negatively to a female observer" or might "assault or harass the observer." *Id.* By contrast, Novedades's showing of irreparable harm rests on its experience of real loss of "prospective customers" and "goodwill" under the very government action Novedades challenges. *Stuhlbarg*, 240 F.3d at 841.

Additionally, the dissent extensively speculates in favor of the government in its analysis. The dissent suggests that Novedades may mitigate the burdens of the Border GTO by using signage to explain the Border GTO's requirements to customers or by raising prices. *See* Dissent at 45-46, 49-50. Alternatively, the dissent theorizes that Novedades will survive the Border GTO because customers may not want to use other MSBs, even though an MSB not subject to the Border GTO exists just a five-minute drive away. *See* Dissent at 49-50.

The government does not raise any of these dissent theories on appeal to challenge the district court's irreparable harm finding, and also introduced no evidence that any of

the dissent's proposed mitigation measures would be feasible or effective for Novedades. Moreover, the government conceded before the district court that "there is evidence of harm in the record" and agreed that the harms Plaintiffs experienced "have gone beyond any speculation." Thus, even though the parties do not ask it to do so, the dissent makes "speculative inferences from facts not in evidence," which give us "no license to reverse a trial court's factual findings." *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 330 (2020), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see also United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018) (the court is not "at liberty to substitute our assumptions for evidence in the record"); *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation," which "rel[ies] on the parties to frame the issues for decision." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008))).

Finally, the dissent credits the government's argument that Novedades may be able to mitigate its compliance burden by automating the CTR reporting process, which would reduce the amount of time it takes to file each CTR. Before the district court, Plaintiffs stated that such software is "typically not designed for small businesses," and alleged that even if software could reduce the time it takes to file each CTR to merely four minutes, Novedades would still have to do "almost five hours per day of added paperwork." Plaintiffs also alleged that explaining the requirements of the Border GTO to customers and collecting customers' information is time consuming separate from filing burdens. According to Escobar, "[c]ustomers do not understand the purpose of the Border GTO," and "were worried that they

will be put on a list with the names of criminals or be mistaken for criminals."

Ultimately, the district court observed that Plaintiffs' estimate of 25 minutes to file each CTR is "optimistic," given that the CTR form itself states that the form will take around 40 minutes to file, and credited Plaintiffs' allegations that the "regulatory burden imposed by the [Border] GTO would be simply unsustainable for Novedades." Even if we would "have arrived at a different result if we had applied the law to the facts of the case," we may not reverse the district court's grant of preliminary injunction on that basis. *Harris*, 772 F.3d at 570 (citation modified).

Based on the evidence above, we cannot hold that the district court clearly erred in finding that Novedades demonstrated a likelihood of irreparable harm because it faced a "threat of extinction" and the loss of its customers and goodwill. *hiQ Labs*, 31 F.4th at 1188 (citation modified). That conclusion is neither "illogical, implausible, or without support in inferences that may be drawn from the record." *Capistrano*, 21 F.4th at 1133 (citation omitted).

### 3. Balance of Equities and Public Interest

Finally, after assessing Plaintiffs' likelihood of success on the merits and of facing irreparable harm, "courts must 'give serious consideration to the balance of equities and the public interest.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 27). In balancing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). The public interest inquiry "primarily addresses impact on non-parties rather than parties." *Bernhardt v. Los Angeles County*, 339 F.3d

920, 931 (9th Cir. 2003) (citation omitted). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

The harm to Plaintiffs absent a preliminary injunction is concrete and severe. Novedades is a small business run by a single owner, Escobar, who depends upon Novedades for her livelihood. Additionally, as discussed above and as the district court found, the record demonstrates that the Border GTO will likely destroy Novedades.

On the other hand, the government argues that enjoining enforcement of the Border GTO during the pendency of this litigation impedes the government's ability to implement a widescale data collection program, the product of which could aid certain national security and law enforcement functions. However, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law . . . ." (citation modified)).

Moreover, as the district court observed, it is not clear that the grant of the preliminary injunction in fact harms the government's ability to "combat emergent threats" because the government failed to explain why it could not "combat emergent threats through other investigatory and prosecutorial tools" at the government's disposal. Further, the government's own description of the benefits of the Border GTO indicates that the government only expected

that data collected from the GTO might be useful in the future, not that such information was critical during the pendency of this litigation.

Therefore, weighing the concrete threat the Border GTO poses to Novedades's existence and Escobar's livelihood against the government's speculative assertions that the Border GTO will keep the public safer, we conclude that the district court did not abuse its discretion in determining that the balance of equities and public interest favor Plaintiffs.

### B.  Scope of Preliminary Injunction

Finally, the government argues that "the court erred by not limiting its injunction to . . . [P]laintiffs alone." We disagree. The district court did not abuse its discretion in limiting the scope of preliminary injunction to the Southern District of California. *See Nat'l Urb. League*, 977 F.3d at 776 (scope of preliminary injunction is reviewed for abuse of discretion).

The district court has authority under 5 U.S.C. § 705 ("Section 705") of the APA to postpone the effective date of unlawful agency actions nationwide, although it may choose to limit the scope of relief under Section 705 in its discretion. Section 705 provides that "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

The scope of interim relief under Section 705 is consistent with the scope of final relief under 5 U.S.C. § 706 ("Section 706") of the APA, which grants federal courts the authority to "hold unlawful and set aside agency action[s]" on a nationwide basis when the challenged action is held

unlawful. *See id.* § 706(2); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules . . . ."); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) ("Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an entire regulatory program." (citation modified)); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("The scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action.").

As the Ninth Circuit previously recognized, the U.S. Supreme Court's decision in *Trump v. CASA, Inc.* does not narrow the scope of the injunctive relief possible under the APA. *See Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (acknowledging that *CASA* "explicitly declined to extend its holding to the APA context"). In *CASA*, the Court held that federal courts generally lack authority to issue "universal" injunctions under the equitable power conferred by the Judiciary Act of 1789. 606 U.S. 831, 841-42 (2025). However, *CASA*'s holding turned on the Judiciary Act's source of equitable authority, and the Court specifically noted that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10. Justice Kavanaugh, concurring in *CASA*, likewise observed that courts may still "preliminarily 'set aside' a new agency rule" and characterized such relief as "the functional equivalent of a universal injunction." *Id.* at

869, 873 (Kavanaugh, J., concurring). Indeed, the U.S. Supreme Court itself has granted universal stays of agency actions pending final merits review. *See Murray Energy Corp. v. EPA*, 577 U.S. 1127 (2016) (staying EPA carbon pollution guidelines); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 113 (2022) (staying OSHA vaccine mandate).

In this case, the district court observed that "consideration of" the "weighty questions of law implicated by the [Border] GTO" "might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals." Thus, the district court limited the scope of the preliminary injunction to the Southern District of California. The district court did not abuse its discretion in doing so.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's order granting a preliminary injunction.

**AFFIRMED.**

LEE, Circuit Judge, dissenting:

Mexican drug cartels smuggle into the United States billions of dollars worth of fentanyl, methamphetamine, heroin, and cocaine.  These cartels launder their money through our financial system, often via money services businesses (MSBs) that offer check cashing, currency exchange services, and money orders.  To combat this problem, the United States Treasury Department's Financial Crimes Enforcement Network (FinCEN) promulgated a geographic targeting order (GTO) for MSBs located near the southwest border.  This GTO (Border GTO) requires all MSBs in 30 ZIP codes within five Texas counties and two California counties to file currency transaction reports for any transaction of more than $200 but less than $10,000.[1]  A currency transaction report requires the business to verify the identity of the person making the transaction (*e.g.*, name, address, SSN/EIN).

The majority opinion affirms the district court's order preliminarily enjoining the Border GTO, even though the plaintiffs—Novedades y Servicios, a small MSB, and its owner, Esperanza Gomez Escobar—have not shown irreparable harm to merit this extraordinary relief.  The plaintiffs assert that the Border GTO will put them out of business but marshal little evidence to support such a claim.  At most, the evidence suggests that compliance will impose unquantified additional costs.  But government policies—ranging from minimum wage to environmental edicts to workplace regulations—routinely impose costs on businesses.  Yet we rarely grant the extraordinary relief of a preliminary injunction against costly governmental policies.

---

[1] FinCen has since revised the threshold amount to $1,000.

Perhaps we are setting a new laxer standard for irreparable harm for government policies that burden businesses. If not, we should remand for the district court to further analyze irreparable harm before we grant a preliminary injunction. I respectfully dissent.

## DISCUSSION

### I. The district court erred by assuming irreparable harm largely based on blanket assertions of financial burden.

We grant preliminary injunctions only in extraordinary circumstances when plaintiffs can show immediate threatened injury. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Plaintiffs must also establish that irreparable harm is likely, not just possible, in the absence of an injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). And in general, purely economic injuries like loss of revenue or additional costs are not irreparable injuries. *See, e.g.*, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980) ("[M]onetary injury is not normally considered irreparable" in the context of a preliminary injunction.").[2] Indeed, irreparable harm has been described as "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction."

---

[2] *See also, e.g.*, *Caribbean Marine Servs. Co.*, 844 F.2d at 674–76 ("[U]nsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm"); *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (financial losses associated with relocating a business due to a government ordinance were not irreparable because that hardship is "economic in nature" and "not normally considered irreparable").

*See* 11A Wright & Miller, Fed. Prac. & Proc. § 2948.[3]  And speculative injury does not constitute irreparable injury.  *Id.*; *see also Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

We also do not rubber stamp a preliminary injunction if there is little to no factual support for the district court's order.  As the majority notes, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  But we do not greenlight it if the district court did not evaluate key relevant factors in evaluating irreparable harm.  *See F.T.C. v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1212 (9th Cir. 2004) ("We may also remand for further

---

[3] The majority claims that threatened loss of prospective customers or goodwill can support irreparable harm.  Although the loss of goodwill and reputation are important considerations in determining the existence of irreparable injury, there must be credible and admissible evidence that such damage threatens Plaintiffs' businesses with termination.  *See Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1163–64 (C.D. Cal. 2003) (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("Without a sufficient showing that these contracts threatened [plaintiff's] existence, any loss in revenue due to an antitrust violation is compensable in damages.")).  And plaintiffs have not offered sufficient evidence to support such a claim.  *See Goldie's Bookstore, Inc. v. Sup. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (reversing preliminary injunction where district court had determined that plaintiff "would lose goodwill and 'untold' customers" because the finding was not based on any factual allegations and was speculative); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (declarations of plaintiff's executives detailing the disruptive effect of defendant's exclusive contracts on plaintiff's business could not support the issuance of a preliminary injunction because they were "conclusory and without sufficient support in facts.").

findings of fact and conclusions of law where a district court's findings and conclusions supporting the preliminary injunction are not sufficient to permit meaningful review."); *Lumbermen's Underwriting All. v. Can-Car, Inc.*, 645 F.2d 17, 18 (9th Cir. 1980) (requiring "comprehensive and pertinent" analysis).

The district court and majority, however, have erred by accepting the plaintiffs' vague assertion that the Border GTO would put them out of business, despite little evidentiary support for the claim. To be sure, if a government policy is so onerous to put a plaintiff out of business, it may constitute irreparable harm. In evaluating whether a business will be forced to shut down, we should consider both costs and revenues. Econ 101 tells us that profit equals revenue minus cost. A company can increase profit by raising revenue and/or decreasing costs. Conversely, a company's profit can decline if its revenue craters and/or costs rise. The plaintiffs, however, have offered scant evidence about these basic pillars of economics. Yet the district court accepted the plaintiffs' assertion that it would go bankrupt. That is clear error.

### A. Costs: The district court failed to sufficiently quantify or estimate how much it will cost to comply with the Border GTO.

The district court did not adequately analyze the costs of complying with the Border GTO in its irreparable harm analysis. True, the Border GTO imposes some burden on the plaintiffs, as it will take time to fill out the currency transaction reports. But whether, as the majority states, the Border GTO will "destroy Novedades" is a complex question that requires more than blind acceptance of broad generalizations.

The plaintiffs admit that they could comply with the Border GTO by, for example, hiring a new employee to handle this paperwork. But they claim that it is unfeasible because of cost concerns. Yet they provide no evidence of how much it would cost to hire someone and whether such costs are so prohibitive that it would debilitate the business. For example, plaintiff Escobar notes, "I think I will need to hire another employee just to process CTRs [Currency Transaction Reports], and I may need to buy more equipment. That will increase my costs." But he does not quantify the costs or even offer a ballpark range. Similarly, the complaint states that "Novedades cannot afford to hire an entire full-time employee just to prepare CTRs" but provides no details or factual support.[4]

The bottom line is that we do not have any facts or numbers to assess the plaintiffs' assertions that they would have to close shop immediately in the absence of an injunction. Would it cost $50,000 to hire an employee to comply with the new paperwork requirements? Maybe $75,000? We simply do not know. And even if the plaintiffs had provided the costs of hiring a new employee, we would also need to know the cash flow or profitability of the plaintiffs' businesses. If their annual profit is, say, $250,000, then the Border GTO would erode their profitability but it presumably would not drive them out of business.

Nor is there much meaningful discussion of the feasibility of other alternative solutions such as adding customer signage or implementing software to expedite paperwork and minimize costs. The majority claims that the

---

[4] While the plaintiffs said nothing about the potential costs of compliance, one non-plaintiff MSB said that it would require hiring two employees who would be paid $12 an hour.

dissent is making "speculative inferences from facts not in the evidence." Majority Op. at 35. But I am merely using hypothetical examples—given the dearth of actual facts from the plaintiffs—to point out that they have failed to carry their burden of persuasion by a clear showing to warrant this "extraordinary" relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Munaf v. Geren*, 553 U.S. 674, 689 (2008). The majority appears satisfied that the "government conceded before the district court that 'there is evidence of harm in the record.'" Majority Op. at 35. But additional costs or time are not necessarily irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."). And where findings of fact are not "sufficiently comprehensive and pertinent," we must remand for "additional and more detailed findings and conclusions." *Lumbermen's Underwriting All.*, 645 F.2d 17 at 18–19.

Even though it does not have the burden here, the government points out that the record evidence shows that software can reduce the compliance burden considerably. Plaintiffs' witnesses even acknowledged the existence of such software in their testimony before the district court but appear not to have availed themselves of the opportunity to implement it. When the district court asked Novedades's counsel whether their "client ever attempted to get the software to batch any of these orders," counsel responded that "it's a great question" and that "she looked into it a bit."

The majority places much weight on Novedades's claim that even if software could reduce the time it takes to file CTRs, Novedades would still have to do "almost five hours per day of added paperwork." Majority Op. at 35. But "five

hours per day of added paperwork" may not necessarily drive Novedades to the brink of insolvency—let alone immediately collapse.  We cannot make such an assessment without better understanding its revenue streams or costs.  For example, are there other cost-cutting measures Novedades can implement to offset any increase in compliance costs?

Of course, MSBs may face challenges in first implementing the software. One declaration  vaguely states that software is not "always compatible with a small MSB's cash transaction systems."  But just because software may not "always" be compatible does not mean that it would not help the plaintiffs manage costs.  Indeed, some Texas MSBs seemed to have found software that works, with one declaration saying that "software has been developed to automate the CTR reporting process, but the software, according to the general manager of an El Paso, Texas MSB, can cost up to $3,700 per month."  Admittedly, $3,700 per month for the software is not an insignificant cost.  But this number is meaningless in analyzing whether there is irreparable harm if we do not know the plaintiffs' monthly revenue.

In essence, the plaintiffs invite us to just trust them when they say the Border GTO is too burdensome.  But we need more evidence if they want the extraordinary relief of a preliminary injunction.  *See S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1139 (9th Cir. 2021) (requiring movant to carry the burden of persuasion "by a clear showing.").  And because the plaintiffs have provided little evidence, the district court's preliminary injunction order lacks the evidence for us to evaluate it.  District court "findings should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's

decision . . . If the findings fail to provide such an understanding and a factual basis for the conclusion, the appellate court may appropriately vacate the judgment and remand the cause to the district court for supplemental findings of fact." *Alpha Distrib. Co. of California v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972). Based on the record before us, we are left in the dark.

## B. Revenue: There was little to no discussion of whether businesses can increase revenue to defray the costs.

On the other side of the ledger, we need to review a company's revenue to see if the costs of compliance would put it out of business.[5] Businesses are resilient and routinely

---

[5] The majority claims, based on Escobar's declaration, that Novedades's losses "were not remote" because "during the single week in which the Border GTO was in effect . . . Novedades lost 50-60% of its customers in the store who learned of the Border GTO's reporting requirements from Escobar." Majority Op. at 33-34. Escobar's declaration is more ambiguous—perhaps intentionally so—than what it might initially appear. It says, "Approximately 50-60% of the customers *we explained the requirement to* left the store without completing a transaction." (emphasis added). In other words, the declaration does not say that Novedades lost 50-60% of its customers. The 50-60% figure only refers to those customers who received an explanation. Some customers may have filled out the forms without asking questions. That figure also may reflect new customers who visited during those few days. In such a case, that number may not reflect an erosion of current customers and revenue but additional future customers and revenue. Finally, whenever a new policy is implemented, customers may at first show reluctance or confusion. But customers often return because viable or convenient alternatives do not exist. To the extent any Novedades "[c]ustomers [did] not understand the purpose of the border GTO," which the majority cites as evidence of loss of goodwill but is expected among customers whenever any new regulatory policy is implemented, Majority Op. at 32, this "simply underscores customer confusion, not irreparable harm."

raise prices (and pass on costs to consumers) in response to burdensome governmental policies. While the majority claims that the "government did not raise any of these dissent theories on appeal," including raising prices, Majority Op. at 34, Plaintiff Escobar admitted that "I am considering raising my prices if the Border GTO goes back into effect, even though I would rather not have to do that." And it would behoove us to fully grapple with plaintiff Escobar's statement so that we have a "comprehensive and pertinent" understanding of the facts to conduct "meaningful review." *See Lumbermen's Underwriting All.*, 645 F.2d at 1212; *Enforma Nat. Prods., Inc.*, 362 F.3d at 1212.

But there is no other evidence on how much the plaintiffs could increase their revenue by raising prices. We have no data on whether the added revenue from higher prices could cover the increased compliance costs. We also do not know if other MSBs have increased prices. Nor do we know the elasticity of demand here. We are also left searching whether the plaintiffs can add value to justify the price increase while minimizing customer loss. In short, we do not know the answers to these basic questions because the plaintiffs failed to provide evidence.

Instead of providing facts and figures, the plaintiffs assert that they fear that raising prices would alienate their customers. One declaration states that the nearest MSB in a zip code not targeted by the Border GTO is a 15-minute drive away, where "customers can drive there to cash their checks without any of this hassle or risk." Novedades claims that a comparable MSB not subject to the Border GTO exists just

---

*Herb Reed Enters., LLC*, 736 F.3d at 1250. In any case, all these ambiguities underscore that the district court should have probed into this issue further.

a five-minute drive from Novedades.  In any case, for some, a ten to 30-minute drive to-and-from is a hassle, especially given the stressful traffic and exorbitant gas prices in places like Southern California.  Many customers might be willing to pay slightly higher prices for the sake of convenience. Other customers might value continuity more than price. Again, we do not know.

Of course, the plaintiffs do not have to provide reams of data or sophisticated econometric analysis to meet their burden, but they must offer sufficient evidence for us to evaluate.  Right now, the record does not let us conclude whether increasing prices can offset compliance costs.  At the very least, we need more information than "I am considering raising my prices," to then conclude that there is irreparable harm.  And even if Novedades did increase their prices and still had decreased revenues, that alone would not necessarily constitute irreparable harm. *See Am. Passage Media Corp.*, 750 F.2d at 1474 (While the "threat of being driven out of business is sufficient to establish irreparable harm," plaintiff's statements, standing alone, that it "sustained large losses in 1982-83" and "forecast large losses again in 1983-84" are "insufficient evidence that [plaintiff] is threatened with extinction.") (citations omitted)).  Yet we do not even have that information. Needless to say, we need more rigorous analysis of irreparable harm and should remand to the district court for further analysis.

And because we lack sufficient evidence about the costs of compliance or the plaintiffs' revenue, we also cannot evaluate another critical element of irreparable harm—the requirement of an "immediate threat." *Caribbean Marine Servs. Co.*, 844 F.2d at 676.  The plaintiffs must show that they will face the "immediate threat" of business extinction,

absent a preliminary injunction.  It is not enough to say that the business would eventually go under because of the increased costs of filing currency transaction reports.  But yet again, the district court and the majority assume—with little evidence—that the plaintiffs have shown that they would face an "immediate threat" of insolvency without a preliminary injunction.

\* \* \* \*

The plaintiffs have not shown irreparable harm to merit the extraordinary relief of a preliminary injunction.  To be fair, the Border GTO will likely burden Novedades.  But a wide range of government policies imposes costs on businesses.    They include environmental regulations, minimum wage laws, paid sick leave and family leave, workplace safety requirements, anti-discrimination and accommodation    obligations,    product    testing    and certification, professional licensing and permits, zoning restrictions, banking regulations, and anti-money laundering controls.  The political branches have deemed such policies worthwhile enough to justify costs that will be borne by businesses and ultimately the consumers.  Here, the federal government has decided that shutting off the financial spigot of the Mexican cartels responsible for the fentanyl crisis justifies the compliance costs of the Border GTO.

Of course, businesses can challenge the legality of government regulations.    Sometimes    they    succeed, sometimes they do not.  The plaintiffs here may well prevail on the merits, as explained in the majority opinion.[6]  But we

---

[6] I note that the majority need not address the arbitrary and capricious question because it already holds that the rule is a policy requiring notice and comment.  But if we address arbitrary and capricious question, we should not make the factual finding—especially when the district court

52      NOVEDADES Y SERVICIOS, INC. V. FINCEN

almost never grant preliminary injunctions against governmental policies just because they impose costs on businesses. Unless we are setting a new standard for irreparable harm for costly regulations burdening businesses, we should remand and allow the district court to further analyze this issue. I respectfully dissent.

---

did not—that the agency did not rely on the March XX date memo. *See Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 711 (9th Cir. 1999) ("Factfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not have resolved in the first instance this factual dispute . . . .") (citations omitted). Here, the district court was skeptical but not make any factual findings. Instead, the district court assumed that the FinCEN Memo did pre-date the Border GTO. I would remand for the district court to make the factual finding.